UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ALAN MILLS,<br><br>                    Plaintiff,<br><br>      v.<br><br>NOAH ZEICHNER,<br><br>                    Defendant. | CASE NO. C23-1130JLR<br><br>ORDER |

## I.    INTRODUCTION

Before the court are *pro se* Plaintiff Alan Mills's motions for partial summary judgment (MSJ (Dkt. # 21); MSJ Reply (Dkt. # 39)), and to hold nonparty Martin Floe in contempt of a subpoena (Contempt Mot. (Dkt. # 41); Contempt Reply (Dkt. # 53)). Defendant Noah Zeichner opposes the motion for partial summary judgment and Mr. Floe opposes the motion for contempt.  (MSJ Resp. (Dkt. # 33); Contempt Resp. (Dkt. # 47).)  Also before the court is Mr. Zeichner's motion for judgment on the pleadings. (MJP (Dkt. # 43); MJP Reply (Dkt. # 65).)  Mr. Mills opposes Mr. Zeichner's motion.

1  (MJP Resp. (Dkt. # 62).)  The court has considered the motions, the litigants'

2  submissions in support of and in opposition to the motions, the relevant portions of the

3  record, and the applicable law.  Being fully advised,[1] the court GRANTS Mr. Zeichner's

4  motion for judgment on the pleadings and DENIES Mr. Mills's motions as moot.

5  ## II.  BACKGROUND

6  The court sets forth the relevant factual background as pleaded by Mr. Mills

7  before turning to the relevant procedural history.

8  Mr. Mills and his wife are residents of Seattle and share a daughter, A.K.  (*See*

9  Compl. (Dkt. ## 1-2 (sealed), 8-6 (redacted)) ¶¶ 4.1, 4.13, 4.21.)  A.K. is an Ingraham

10  High School student who participated in an extracurricular academic competition called

11  the "Euro Challenge" in 2022.  (*Id.* ¶¶ 4.1-4.2.)  The Euro Challenge is a national

12  competition in which high school students give formal presentations about topics related

13  to the European economy.  (*See id.* ¶ 4.2.)  Typically, teams of students travel to New

14  York City to give their final presentations.  (*See id.* ¶ 4.14.)  Ingraham's Euro Challenge

15  team consisted of A.K. and six other students, and was advised by Mr. Zeichner, an

16  Ingraham social studies and Spanish teacher.  (*Id.* ¶¶ 2.2, 4.2-4.3.)  As an adviser, Mr.

17  Zeichner "regularly met with the Euro Challenge Team, critiqued its work, arranged for

18  its meeting space, arranged for its formal practice presentation," and communicated with

19  competition representatives.  (*Id.* ¶ 4.3.)

20

21  _____

    [1]  None of the litigants have requested oral argument (*see* MSJ at 1; MSJ Resp. at 1;
    Contempt Mot. at 1; Contempt Resp. at 1; MJP at 1; MJP Resp. at 1), and the court determines

22  that oral argument would not be helpful to its disposition of the motions, *see* Local Rules W.D.
    Wash. LCR 7(b)(4).

1    Initially, Mr. Mills was actively involved in the Euro Challenge team's

2  preparation, assisting in the research and analysis as well as critiquing practice

3  presentations.  (*Id.* ¶ 4.4.)  But Mr. Mills began to observe that the Euro Challenge was

4  causing excess stress to A.K., whose team members "were not carrying their weight."

5  (*Id.* ¶¶ 4.6.1-4.6.2.)  It also became clear to Mr. Mills "that the team's presentation was

6  only mediocre compared with prior winning Euro Challenge presentations," and that "the

7  Euro Challenge Team was almost certainly not going to become a finalist for the

8  competition."  (*Id.* ¶ 4.6.3.)  Mr. Mills "did not want [A.K.] to be satisfied with such

9  mediocrity."  (*Id.*)  In addition, Mr. Mills grew concerned that Mr. Zeichner "was making

10  poor decisions" and that his "poor leadership was harming [A.K.]."  (*Id.* ¶ 4.6.6.)

11    For these reasons, on April 11, 2022, Mr. Mills asked A.K. to stop participating in

12  the Euro Challenge.  (*Id.* ¶ 4.6.)  Mr. Mills emailed Mr. Zeichner the same day and

13  copied A.K. on the message, in which he expressed discomfort with Mr. Zeichner's

14  decision-making abilities and stated his desire that A.K. stop participating.  (*Id.* ¶ 4.7; *Id.*,

15  Ex. 2.)  Mr. Zeichner responded, addressing some of Mr. Mills's concerns, advising that

16  he would remove Mr. Mills from email communications with other parents about the

17  competition, and stating, "[i]f you are willing to reconsider your decision and have a

18  conversation about the trip [to New York], please let me know."  (*Id.*, Ex. 2.)  Mr. Mills

19  replied, "I still think it is best for [A.K.] to spend her time on pursuits other than the Euro

20  Challenge competition."  (*Id.*)

21    Meanwhile, A.K. and Mr. Zeichner exchanged emails about the competition.  A.K.

22  apologized to Mr. Zeichner, stating that her father's decision "was made without my

1   knowledge and I only heard about it through the email he sent," and that she "want[ed] to

2   do whatever is possible to help the team." (*Id.*, Ex. 3.)  A.K. also asked Mr. Zeichner to

3   "refrain from telling my group members or their families about this until I let them

4   know," stating she would "most likely let my group members know Wednesday after I

5   know this situation is not going to change." (*Id.*)  Mr. Zeichner responded:  "I'm sorry

6   too.  Let's hold off on saying anything to the other students and families until we receive

7   the actual schedule and travel details from New York. . . .  I will email your dad when I

8   have those details . . . hopefully I can meet with your dad and we can work this out."

9   (*Id.*)

10       Mr. Mills alleges that after April 14, 2023, he received no further communications

11   from Mr. Zeichner about the Euro Challenge and he believed that A.K. had stopped

12   participating.  (*See id.* ¶¶ 4.10-4.11, 4.15, 4.17.)  Nevertheless, because A.K. "was angry

13   about" Mr. Mills's decision, and because Mr. Zeichner "was encouraging her to stay on

14   the Euro Challenge Team," A.K. "disobeyed and deceived" Mr. Mills by continuing to

15   participate.  (*Id.* ¶ 4.15.)  Mr. Mills alleges that Mr. Zeichner supported A.K.'s

16   participation by continuing "to host meetings of Euro Challenge Team members

17   (including [A.K.]) in his classroom" and continuing "to help the Euro Challenge Team

18   (including [A.K.]) to prepare for and give the final presentation." (*Id.*)  A.K. participated

19   up to and through the final presentation in May 2022, which the team gave virtually via

20   Zoom due to COVID-19 restrictions.  (*Id.*)  A.K.'s mother knew of A.K.'s participation

21   but never informed Mr. Mills, who did not learn of A.K. and Mr. Zeichner's "deception"

22   until August 20, 2022.  (*Id.* ¶¶ 4.16-4.18.)

1       From April 11, 2022, to August 20, 2022, A.K. did not speak to her father.  (*Id.*

2  ¶ 4.18.)  Mr. Mills refers to this time as A.K.'s "Silent Period."  (*Id.*)  Whenever Mr.

3  Mills attempted to talk to A.K. during this time, he was met with "passive aggression and

4  silence," and the two resorted to communicating through email.  (*Id.* ¶¶ 4.20-4.21.)  Mr.

5  Mills alleges that during this time, A.K.'s "physical and mental health dramatically

6  deteriorated."  (*Id.* ¶ 4.22.)  She experienced frequent headaches, stomach aches, nausea,

7  and loss of appetite.  (*Id.*)  A.K.'s personality also "dramatically changed," becoming

8  "subdued and morose."  (*Id.* ¶ 4.23.)  Her "speech became nearly inaudible, slurred, and

9  hard to understand," and "her speech toward family members became often biting,

10  sarcastic, and harsh."  (*Id.*)  She also no longer enjoyed her schoolwork.  (*Id.*)  These

11  symptoms and personality changes allegedly persist to this day.  (*Id.* ¶¶ 4.22-4.23.)

12  According to Mr. Mills, A.K. told him that, in retrospect, she believes Mr. Zeichner

13  "acted wrongly" and that in doing so, he "harmed both her and her family."  (*Id.* ¶ 4.24.)

14       Acting *pro se*, Mr. Mills filed this action on or around June 30, 2023, in King

15  County Superior Court.  (*Id.* at 1.)  Mr. Mills raises a claim under 42 U.S.C. § 1983,

16  alleging that Mr. Zeichner unlawfully interfered with Mr. Mills's fundamental

17  constitutional right to parent by encouraging A.K. to continue participating in the Euro

18  Challenge against Mr. Mills's express wishes.  (*Id.* ¶¶ 6.C.1-6.C.9.)  Mr. Mills also raises

19  state law claims for intentional infliction of emotional distress ("IIED") and under RCW

20  4.24.010, a wrongful death and injury statute.  (*Id.* ¶¶ 6.A.1-6.B.6.)  Mr. Zeichner

21  removed the matter to this court on July 28, 2023.  (Not. of Removal (Dkt. # 1).)  Mr.

22  //

1    Zeichner answered the complaint and raised a number of affirmative defenses, including

2    qualified immunity.  (Am. Answer (Dkt # 29) at 9-11.)

3         On October 2, 2023, Mr. Mills filed a motion for partial summary judgment

4    concerning qualified immunity.  (*See generally* MSJ.)  The motion seeks a ruling that:

5    (1) Mr. Mills's Section 1983 claim "is valid"; (2) Mr. Zeichner "cannot use the doctrine

6    of qualified immunity to prevent [Mr. Mills] from suing him under [Section] 1983"; and

7    (3) Mr. Mills's Section 1983 claim "can go forward."  (*Id.* at 8.)  Meanwhile, the parties

8    had been engaged in discovery, and on October 30, 2023, Mr. Mills filed a motion to hold

9    Mr. Floe—the Ingraham principal—in contempt of a subpoena.  (*See generally* Contempt

10   Mot.)  Mr. Mills had sought certain documents from Mr. Floe, who allegedly failed to

11   appear to produce those documents.  (*Id.* at 2-3.)  Shortly thereafter, on November 3,

12   2023, Mr. Zeichner filed a motion for judgment on the pleadings, seeking to dismiss this

13   entire case.  (*See generally* MJP.)  Each motion remains pending before the court.

### III.   ANALYSIS

15        Below, the court addresses Mr. Zeichner's motion for judgment on the pleadings,

16   as it is dispositive of this case.  The court begins by setting forth the relevant legal

17   standard and addressing the parties' procedural arguments before turning to the merits.

18   **A.   Legal Standard**

19        Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—

20   but early enough not to delay trial—a party may move for judgment on the pleadings."

21   Fed. R. Civ. P. 12(c).  "Judgment on the pleadings is proper when the moving party

22   clearly establishes on the face of the pleadings that no material issue of fact remains to be

1   resolved and that [they are] entitled to judgment as a matter of law." *Hal Roach Studios,*

2   *Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1990). Because a

3   motion for judgment on the pleadings is "functionally identical" to a motion to dismiss,

4   the standard for a Rule 12(c) motion is the same as for a Rule 12(b)(6) motion. *Dworkin*

5   *v. Hustler Mag., Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989); *Cafasso v. Gen. Dynamics C4*

6   *Sys., Inc.*, 637 F.3d 1047, 1055 n.4 (9th Cir. 2011).

7   When considering a Rule 12(b)(6) or 12(c) motion, the court may consider the

8   pleadings, documents attached to the pleadings, documents incorporated therein, or

9   matters of judicial notice. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003);

10  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). The court must accept the

11  non-moving party's well-pleaded factual allegations as true and draw all reasonable

12  inferences in favor of the non-moving party. *Hines v. Youseff*, 914 F.3d 1218, 1227 (9th

13  Cir. 2019); *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir.

14  1998). However, the court is not required to accept as true legal conclusions or

15  "formulaic recitation[s] of the elements of a cause of action." *Chavez v. United States*,

16  683 F.3d 1102, 1008 (9th Cir. 2012) (first citing *Bell Atl. Corp. v. Twombly*, 550 U.S.

17  544, 570 (2007); and then citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The

18  complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to

19  relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at

20  570). "A claim has facial plausibility when the plaintiff pleads factual content that allows

21  the court to draw the reasonable inference that the defendant is liable for the misconduct

22  alleged." *Id.*

1    **B.    Procedural Matters**

2         As a threshold matter, both parties raise procedural arguments under Federal Rule

3    of Civil Procedure 12(d).  That rule provides that if "matters outside the pleadings are

4    presented to and not excluded by the court" on a motion for judgment on the pleadings,

5    "the motion must be treated as one for summary judgment."  Fed. R. Civ. P. 12(d).

6         Mr. Mills argues the court should treat Mr. Zeichner's motion as one for summary

7    judgment because it "employ[s] reasoning based on assumptions far outside the pale of

8    undisputed 'facts,'" and therefore improperly relies on materials outside the pleadings.

9    (Resp. at 39-40 ("For example, many of the arguments assume that the injuries to [A.K.]

10   and Plaintiff are either non-existent or far milder than the Complaint alleges.").)  That

11   Mr. Mills disagrees with Mr. Zeichner's characterization of the facts does not mean that

12   Mr. Zeichner's motion relies on materials outside the pleadings.  Mr. Mills has not

13   pointed to any documents, materials, or evidence relied on in the motion that do not

14   appear in the pleadings.  *See* Fed. R. Civ. P. 12(d).  (*See generally* MJP Resp.)  The court

15   therefore declines Mr. Mills's invitation to treat the instant motion as one for summary

16   judgment.

17        Next, Mr. Mills asks the court to take judicial notice of certain documents that he

18   acknowledges are, "strictly speaking, beyond the Complaint," including affidavits of

19   A.K. and A.K.'s mother as well as emails between Mr. Zeichner and various nonparties.

20   (Resp. at 9-10.)  Mr. Zeichner argues the court should strike and/or exclude these

21   documents pursuant to Rule 12(d), as they are not subject to judicial notice under Federal

22   Rule of Evidence 201(b).  (Reply at 12-13.)  "The court may judicially notice a fact that

1  is not subject to reasonable dispute."  Fed. R. Evid. 201(b); *see also Rivera v. Philip*

2  *Morris, Inc.*, 395 F.3d 1142, 1151 (9th Cir. 2005) ("Because the effect of judicial notice

3  is to deprive a party of an opportunity to use rebuttal evidence, cross-examination, and

4  argument to attack contrary evidence, caution must be used in determining that a fact is

5  beyond controversy under Rule 201(b)." (quoting *Wright v. Brooke Grp. Ltd.*, 114 F.

6  Supp. 2d 797, 816 (N. D. Iowa 2000))).  The court has reviewed the materials provided

7  by Mr. Mills and concludes they are not appropriate for judicial notice because they

8  contain facts subject to reasonable dispute.  The court therefore DENIES Mr. Mills's

9  request for judicial notice and excludes the documents from its consideration of the

10  instant motion.  Fed. R. Evid. 201(b); Fed. R. Civ. P. 12(d).

11  **C.    Standing**

12       Turning to the merits of the instant motion, Mr. Zeichner argues that Mr. Mills

13  lacks standing to bring his claims.  The court disagrees.

14       "Plaintiffs must demonstrate standing for each claim that they press."  *TransUnion*

15  *LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  At the pleading stage, a plaintiff must clearly

16  allege facts demonstrating each element of standing under Article III of the United States

17  Constitution.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  To establish Article III

18  standing, a plaintiff must show that he "(1) suffered an injury in fact, (2) that is fairly

19  traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed

20  by a favorable judicial decision."  *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518

21  (1975)).  Washington law similarly requires a plaintiff to show that he suffered an injury

22  in fact.  *Wash. State Housing Fin. Comm'n v. Nat'l Homebuyers Fund, Inc.*, 445 P.3d

ORDER - 9

1   533, 537 (Wash. 2019) (noting that state law "standing is not intended to be a particularly

2   high bar," and instead "serves to prevent a litigant from raising another's legal right").

3   "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a

4   legally protected interest' that is 'concrete and particularized' and 'actual or imminent,

5   not conjectural or hypothetical.'"  *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S.

6   555, 560 (1992)).  Generally, a plaintiff does not have standing to assert claims on behalf

7   of parties who are not before the court.  *See Warth*, 422 U.S. at 499 (stating that an

8   injured party "must assert his own legal rights and interests, and cannot rest his claim to

9   relief on the legal rights or interests of third parties"); *see also Johns v. Cnty. of San*

10  *Diego*, 114 F.3d 874, 876 (9th Cir. 1997) ("[C]onstitutional claims are personal and

11  cannot be asserted vicariously.").  Thus, a plaintiff "must allege a distinct and palpable

12  injury *to himself*."  *Warth*, 422 U.S. at 501 (emphasis added).

13       Here, Mr. Zeichner argues that Mr. Mills lacks standing because he (1) fails to

14  articulate an "actionable constitutional injury" in fact (MJP at 17),[2] and (2) improperly

15  seeks to redress harm to A.K. rather than himself.  Neither argument is persuasive.

16       First, Mr. Mills has adequately pleaded an injury in fact with respect to his Section

17  1983 claim:  the alleged deprivation of his fundamental right to direct the upbringing of

18  his child.  (*See* Compl. ¶¶ 6.C.1-6.C.9); *see also Fields v. Palmdale Sch. Dist.*, 427 F.3d

19

20  ――――――――――
     [2]  The court understands the term "constitutional injury," as used by Mr. Zeichner, to
21  mean an injury caused by the alleged violation of Mr. Mills's constitutional rights, as opposed to
    an injury sufficient to confer Article III standing.  (*See* MJP at 17 (arguing that Mr. Mills's
    claimed harm "does not constitute the type of permanent familial damage or deprivation of [Mr.
22  Mills's] parental rights to constitute an actionable constitutional injury").)

1197, 1204 (9th Cir. 2005) ("The Supreme Court has held that the right of parents to

make decisions concerning the care, custody, and control of their children is a

fundamental liberty interest protected by the Due Process Clause.").  That is sufficient for

standing purposes.  In arguing to the contrary, Mr. Zeichner claims that Mr. Mills has not

alleged an "actionable constitutional injury" because the stated harm "boil[s] down" to

mere "familial stress and conflict."  (MJP at 17-18 (arguing that district courts in this

Circuit have declined to recognize constitutional injury premised on nothing more than

familial discord).)  Mr. Zeichner appears to confuse the question of standing with the

merits of Mr. Mills's Section 1983 claim.  In essence, Mr. Zeichner argues that Mr. Mills

lacks standing because his alleged injury is based on a constitutional claim that fails as a

matter of law and therefore is not "actionable."  (*See id.* at 17-19.)  But Mr. Zeichner's

cited cases do not support this proposition.

For example, in *Harry A. v. Duncan*, two parents sued high school officials after

their daughter was unknowingly videotaped in the locker room by male students.  351 F.

Supp. 2d 1060, 1063-65 (D. Mont. 2005).  Because the parents had conceded that they

lacked standing to bring a derivative Section 1983 claim based on their daughter's injury,

the parents attempted to avoid summary judgment by arguing that they themselves had

suffered constitutional injury to the parent-child relationship.  *Id.* at 1066.  The district

court observed that existing precedent established "a constitutionally protected right to be

free from *termination* of the parent-child relationship," but not from mere "disturb[ance

to] the *tranquility* of the parent-child relationship."  *Id.* at 1068 (emphasis added).  The

parents' alternative theory of injury fell short of alleging termination of the parent-child

1    relationship, and the court therefore granted summary judgment because the parents

2    "failed to allege facts that would allow a reasonable jury to find in their favor"—not

3    because they lacked standing. *Id.* at 1068-69. Accordingly, *Harry A* does not suggest

4    that Mr. Mills lacks standing because his alleged injury amounts to mere familial conflict.

5    And Mr. Zeichner's other cited cases do not support his position, either. (*See* MJP at 18

6    (first citing *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1060 (9th Cir. 2019) (no mention

7    of standing); then citing *Benitez v. Gresham-Barlow Sch. Dist.*, 3:12-CV-1003-ST, 2012

8    WL 3878419, at *7 (D. Ore. Sept. 6, 2012) (same); and then citing *Teen Rescue v.

9    Becerra*, No. 2:19-cv-00457-JAM-EFB, 2019 WL 4511622, at *1 (E.D. Cal. Sept. 19,

10   2019) (dismissing claim for lack of standing where a challenged statute did not actually

11   compel the plaintiff to do anything and the alleged constitutional injury was therefore

12   "hypothetical" and not "real").) That Mr. Mills's claimed injury stems from an alleged

13   constitutional deprivation that may not ultimately be actionable does not necessarily

14   preclude standing. The court concludes that Mr. Mills has sufficiently pleaded an injury

15   in fact with respect to his Section 1983 claim.

16        To the extent Mr. Zeichner seeks dismissal of Mr. Mills's other claims based on

17   his alleged failure to articulate an "actionable constitutional injury," Mr. Zeichner is

18   misguided. (*See* MJP at 17 (appearing to argue that Mr. Mills lacks standing to pursue

19   *any* of his "claims" because "he has not alleged a concrete and particularized injury to his

20   parental rights" (capitalization altered)).) Neither the tort of IIED nor RCW 4.24.010

21   requires a showing of constitutional injury; such a showing is relevant only to Mr. Mills's

22   Section 1983 claim. In any event, Mr. Mills has articulated an injury in fact sufficient to

1    confer standing as to his claims for IIED and wrongful injury of a child.  (*See* Compl.

2    ¶¶ 6.A.3 (alleging that Mr. Zeichner's "outrageous conduct . . . caused injury . . . to

3    Plaintiff"), 6.B.3 (alleging that Mr. Zeichner's acts "substantially injured" and "caused

4    disruption of the parent-child relationship between [A.K.] and Plaintiff").)  The court

5    therefore declines to grant judgment on the pleadings with respect to Mr. Mills's claims

6    for IIED and under RCW 4.24.010 based on the lack of an "actionable constitutional

7    injury."  (MJP at 17.)

8           Second, Mr. Mills has sufficiently alleged injury to himself.  To start, Mr. Mills's

9    Section 1983 claim is premised on the alleged violation of his fundamental right to

10   parent—a right that Mr. Mills himself plainly holds.  (*See* Compl. ¶¶ 6.C.1-6.C.9); *see*

11   *also Pierce*, 268 U.S. at 534-35.  Mr. Mills's claim under RCW 4.24.010 for injury to the

12   parent-child relationship is similarly premised on harm to Mr. Mills—specifically, the

13   "loss of love and companionship from [A.K.]."  (Compl. ¶ 6.B.4.)  Whether Mr. Mills has

14   standing to assert his state law IIED claim is a closer call, as the complaint primarily

15   seeks compensation for *A.K.*'s emotional distress.  (*See id.* ¶¶ 6.A.3-6.A.4 (alleging that

16   Mr. Zeichner's conduct "caused extreme emotional distress for [A.K.]," which

17   manifested in physical illness and a "dramatic personality change").)  But the court is

18   mindful that it must construe *pro se* pleadings liberally, *Erickson v. Pardus*, 551 U.S. 89,

19   94 (2007), and here, the complaint expressly states that Mr. Zeichner's "outrageous

20   conduct . . . caused injury to [A.K.] *and to Plaintiff*."  (Compl. ¶ 6.A.3 (emphasis

21   added).)  Accordingly, Mr. Mills has standing to assert his IIED claim to the extent he

22   //

1   seeks to redress harm to himself.  The court therefore declines to grant judgment on the

2   pleadings based on lack of standing.

3   **D.      Immunity**

4          Mr. Zeichner argues judgment on the pleadings is warranted because federal and

5   state law immunize him from liability for Mr. Mills's claims.  Mr. Zeichner raises three

6   potential bases for immunity, and the court addresses each in turn.

7          1.  Qualified Immunity

8          Mr. Zeichner argues that qualified immunity shields him from liability under

9   Section 1983, and the court agrees.  Qualified immunity "protects government officials

10  from liability for civil damages unless their conduct violates 'clearly established statutory

11  or constitutional rights of which a reasonable person would have known.'"  *Horton by*

12  *Horton v. City of Santa Maria*, 915 F.3d 592, 599 (9th Cir. 2019) (quoting *Harlow v.*

13  *Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Ziglar v. Abbasi*, 582 U.S. 120, 150

14  (2017) ("Government officials are entitled to qualified immunity with respect to

15  'discretionary functions' performed in their official capacities.").  The doctrine gives

16  officials "breathing room to make reasonable but mistaken judgments about open legal

17  questions."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).  Qualified immunity protects

18  "all but the plainly incompetent or those who knowingly violate the law."  *Malley v.*

19  *Briggs*, 475 U.S. 335, 341 (1986).  In evaluating qualified immunity, the court must ask

20  two questions:  "(1) whether, taking the facts in the light most favorable to the

21  nonmoving party, the government official's conduct violated a constitutional right, and

22  (2) whether the right was clearly established at the time of the alleged misconduct."  *C.F.*

1  *ex rel. Farnan v. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 986 (9th Cir. 2011).  "If

2  the answer to either is 'no,' the official cannot be held liable for damages."  *Id.*  The court

3  "may address the second question first, particularly where 'it is plain that a constitutional

4  right is not clearly established but far from obvious whether in fact there is such a right.'"

5  *Id.* (quoting *Pearson v. Callahan*, 555 U.S 223, 237 (2009)).  The court begins and ends

6  its analysis in this case with the second question.

7         A clearly established right is one that is "sufficiently clear that every reasonable

8  official would have understood that what he is doing violates that right."  *Isayeva v.*

9  *Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017); *see also Shafer v. Cnty. of*

10 *Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) ("[C]ase law must ordinarily have

11 been earlier developed in such a concrete and factually defined context to make it

12 obvious to all reasonable government actors, in the defendant's place, that what he is

13 doing violates federal law.").  Courts must not "'define clearly established law at a high

14 level of generality.'"  *Farnan*, 654 F.3d at 986 (quoting *al-Kidd*, 563 U.S. at 742).  A

15 "sweeping statement of the law is . . . inappropriate for assessing whether qualified

16 immunity applies."  *Id.* at 987; *see also, e.g.*, *al-Kidd*, 563 U.S. at 742 ("The general

17 proposition, for example, that an unreasonable search or seizure violates the Fourth

18 Amendment is of little help in determining whether the violative nature of particular

19 conduct is clearly established.").  Rather, the right alleged to have been violated must be

20 defined in a "more particularized manner" and with "specificity."  *Id.* at 986-87 (internal

21 quotation marks omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)).

22 Although it is not necessary to identify a case "precisely like this one," *Eng v. Cooley*,

1  552 F.3d 1062, 1076 (9th Cir. 2009), there must be "some parallel or comparable factual

2  pattern" to establish that the contours of the right were clearly established, *Clairmont v.*

3  *Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011).  Thus, plaintiffs "generally

4  'must identify a case where an officer acting under similar circumstances as [the

5  defendant] was held to have violated [that right]." *Shafer*, 868 F.3d at 1117.

6      The court concludes that the right of which Mr. Mills was allegedly deprived was

7  not so "clearly established" as to defeat qualified immunity.  Indeed, Mr. Mills fails to

8  articulate the claimed right with any degree of particularity beyond his "fundamental

9  federal and Constitutional rights regarding the care, upbringing, and education of [his]

10  child" (Resp. at 21), which he alternatively describes as his parental right "to care for the

11  health and welfare of his daughter" (*id.* at 38) and "to protect his child" (*id.* at 32).  (*See*

12  *generally id.*; Compl.)  This is the type of generalized and "sweeping statement of the

13  law" that the Supreme Court has expressly warned against in the context of qualified

14  immunity.  *Farnan*, 654 F.3d at 986; *see also al-Kidd*, 563 U.S. at 742.  Mr. Mills's

15  overly broad framing of the claimed right in this case is perhaps understandable, as no

16  court has ever recognized the fundamental due process right of a parent to compel a

17  public school teacher to prevent a child from voluntarily participating in an

18  extracurricular academic activity.  Mr. Mills has cited no case to this effect (*see generally*

19  Resp.), and the court is not aware of any such case.  Existing precedent makes clear that

20  the fundamental right of parents to direct the upbringing and education of their children is

21  neither unlimited nor does it extend as far as Mr. Mills would have it.  *See, e.g.*, *Fields*,

22  427 F.3d at 1204-05 (collecting cases illustrating that "parents' liberty interest in the

custody, care, and nurture of their children" is not exclusive and frequently gives way to state regulation in educational settings).  The Ninth Circuit has expressly adopted the view that, although

> parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child.  Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or . . . a dress code, these issues of public education are generally committed to the control of state and local authorities.

*Id.* at 1206 (quoting *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395-96 (6th Cir. 2005)).  In other words, the fundamental right of parents to direct the upbringing and education of their children "does not extend beyond the threshold of the school door." *Id.* at 1207.  Accordingly, nothing in the law would have made clear to a reasonable person in Mr. Zeichner's position that encouraging A.K. to continue voluntarily participating in the Euro Challenge would violate Mr. Mills's constitutional rights. *See Isayeva*, 872 F.3d at 946.  Mr. Zeichner is therefore entitled to qualified immunity.

Mr. Mills argues the doctrine of qualified immunity does not apply because Mr. Zeichner's allegedly offensive conduct reflected ministerial rather than discretionary functions.  (Resp. at 10-11 (citing *Harlow v. Fitzgerald*, 457 U.S. 800 (1982) (stating that qualified "[i]mmunity generally is available only to officials performing discretionary functions" as opposed to "'ministerial' tasks")).)  The court is not persuaded.  A ministerial duty "is one in respect to which nothing is left to discretion.  It is a simple, definite duty, arising under circumstances admitted or proved to exist and imposed by

1    law." *Gaines v. Thompson*, 74 U.S. 347 (1868).  Mr. Mills offers no explanation why he

2    believes Mr. Zeichner's conduct should be considered ministerial.  (*See id.*)  Even when

3    viewed in the light most favorable to Mr. Mills, none of the factual allegations in the

4    complaint suggest that Mr. Zeichner's conduct was anything other than discretionary.

5    (*See generally* Compl.)  Indeed, as Mr. Zeichner points out, "Mr. Mills's Complaint

6    consists of allegations criticizing Mr. Zeichner for his judgment, 'poor teacher

7    leadership,' and 'poor decisions' relating to his advisory role for the Euro Challenge

8    club."  (Reply at 3-4 (citing Compl. ¶ 4.6.6).)  Mr. Zeichner's discretionary decisions lay

9    at the very core of this case.

10   Because Mr. Zeichner is entitled to qualified immunity, the court GRANTS Mr.

11   Zeichner's motion for judgment on the pleadings with respect to Mr. Mills's Section

12   1983 claim.

13          2.  20 U.S.C. § 7946

14   Mr. Zeichner next invokes immunity under the Paul D. Coverdell Teacher

15   Protection Act of 2001, 20 U.S.C. § 7941 *et seq.* (the "Coverdell Act").  (MJP at 14-15.)

16   The purpose of the Coverdell Act "is to provide teachers, principals, and other school

17   professionals the tools they need to undertake reasonable actions to maintain order,

18   discipline, and an appropriate educational environment."  20 U.S.C. § 7942.  To that end,

19   the Coverdell Act provides that "no teacher in a school shall be liable for harm caused by

20   an act or omission of the teacher on behalf of the school" where the teacher was acting

21   within the scope of their employment and "in furtherance of efforts to control, discipline,

22   expel or suspend a student or maintain order or control in the classroom or school."  20

1  U.S.C. § 7946(a)(1)-(3).  *See, e.g.*, *Wormuth v. Lammersville Union Sch. Dist.*, 305 F.

2  Supp. 3d 1108, 1114-16, 1131 (E.D. Cal. 2018) (holding a school principal was entitled

3  to immunity under the Act for allegedly negligent conduct pertaining to the control and

4  discipline of a student who harassed the plaintiffs' child).

5  　　　　Here, the complaint is devoid of factual allegations suggesting that Mr. Zeichner's

6  allegedly unlawful conduct pertains to the control or discipline of a student.  Rather, the

7  challenged conduct relates to an extracurricular activity that A.K. voluntarily undertook

8  with Mr. Zeichner's encouragement.  (*See* Compl. ¶¶ 4.2-4.3, 4.6.6, 4.7-4.15 (describing

9  Mr. Zeichner's actions in encouraging A.K. to continue participating in the Euro

10  Challenge without Mr. Mills's knowledge or permission).)  Because the conduct at issue

11  does not relate to the control or discipline of a student, Mr. Zeichner is not entitled to

12  immunity under the Coverdell Act.

13  　　　　3.  RCW 4.24.470

14  　　　　Lastly, Mr. Zeichner invokes RCW 4.24.470 as a basis for immunity.  (MJP at

15  15-16.)  RCW 4.24.470 provides that "[a]n appointed or elected official or member of the

16  governing body of a public agency is immune from civil liability for damages for any

17  discretionary decision or failure to make a discretionary decision within his or her official

18  capacity."  RCW 4.24.470(1).  *See, e.g.*, *Doscher v. Timberland Reg'l Libr.*, No.

19  3:22-cv-05340-RJB, 2022 WL 4534403, at *1, *7 (W.D. Wash. Sept. 28, 2022) (applying

20  RCW 4.24.470 to immunize library board members from claims stemming from incidents

21  in which library staff instructed the plaintiff to comply with COVID-19 masking

22  policies).  The statute expressly defines "public agency" to include school districts, and it

1   defines "governing body" as "the policy-making body of a public agency."  RCW

2   4.24.470(2)(a)-(b).

3          The court fails to see how RCW 4.24.470 applies to Mr. Zeichner, a public school

4   teacher.  To qualify for immunity under that statute, Mr. Zeichner would have to show

5   that he is an "appointed or elected official" or that he is a member of the policy-making

6   body of Seattle Public Schools, RCW 4.24.470(1), but he has shown neither.  (*See*

7   *generally* Am. Answer (Dkt. # 29) (no allegation that Mr. Zeichner is appointed, elected,

8   or belongs to the school board); MJP (same); MJP Reply (same).)  Although Mr.

9   Zeichner would interpret the statute broadly to encompass discretionary acts by any

10  government employee undertaken within the scope of employment (MJP Reply at 6-7),

11  such an expansive reading would contravene the plain language of the statute, which

12  unambiguously limits discretionary immunity to only certain government officials.  *See*

13  RCW 4.24.470(1).  The court concludes that Mr. Zeichner does not fall within the class

14  of government officials protected by RCW 4.24.470.

15  **E.    Mr. Mills's Remaining Claims**

16         Because qualified immunity shields Mr. Zeichner from liability under 42 U.S.C.

17  § 1983 but his other theories of immunity fail, Mr. Mills's state law claims remain to be

18  addressed.  The court next examines whether Mr. Mills has stated a claim for IIED or

19  wrongful injury of a child under RCW 4.24.010.  For the reasons set forth below, Mr.

20  Zeichner is entitled to judgment on the pleadings with respect to each remaining claim.

21  //

22  //

ORDER - 20

1        1.   <u>IIED</u>

2        Mr. Mills raises a claim for IIED.  To prove such a claim, a plaintiff must establish

3    the following elements: (1) extreme and outrageous conduct, (2) intentional or reckless

4    infliction of emotional distress, and (3) the actual result of severe emotional distress to

5    the plaintiff.  *Kloepfel v. Bokor*, 66 P.3d 630, 632 (Wash. 2003).  The first element

6    requires proof that the conduct was "so outrageous in character, and so extreme in degree,

7    as to go beyond all possible bounds of decency, and to be regarded as atrocious, and

8    utterly intolerable in a civilized community."  *Robel v. Roundup Corp.*, 59 P.3d 611, 619

9    (Wash. 2002) (quoting *Dicomes v. State*, 782 P.2d 1002, 1012 (Wash. 1989)).  In

10   addition, a third party IIED plaintiff "must be an immediate family member of the person

11   who is the object of the defendant's actions, and he must be present at the time of such

12   conduct."  *Reid v. Pierce Cnty.*, 961 P.2d 333, 337 (Wash. 1998) (quoting *Grimsby v.*

13   *Samson*, 530 P.2d 291, 295 (Wash. 1975)) (affirming dismissal of IIED claim because the

14   plaintiffs "were simply not present when the conduct occurred").

15       Mr. Mills's IIED claim fails for two reasons.  First, Mr. Mills does not allege that

16   he was physically present to witness any of the conduct at issue (*see generally* Compl.),

17   which is a requirement of third-party IIED claims in Washington, *Reid*, 961 P.2d at 337.

18   Mr. Mills instead alleges that Mr. Zeichner conspired with A.K. outside his presence and

19   without his knowledge.  (*See id.* ¶¶ 4.9-4.15, 4.17.)  In fact, Mr. Mills did not even learn

20   of the offending conduct until months after it happened.  (*Id.* ¶¶ 4.7 (explaining that Mr.

21   Mills withdrew his consent to A.K.'s participation in the Euro Challenge on April 11,

22   2022), 4.15 (stating that A.K. continued participating through May 2022), 4.17 ("I did not

1  find out about Zeichner's and [A.K.]'s deception until August 20, 2022.").)  This case is

2  no different than *Lund v. Caple*, where the Washington Supreme Court affirmed the

3  dismissal of an IIED claim because the plaintiff "did not even learn of the conduct until

4  several months later."  *Lund v. Caple*, 675 P.2d 226, 228-29 (Wash. 1984) (holding an

5  IIED claim against a pastor who slept with the plaintiff's wife was "fatal[ly] flaw[ed]"

6  because the plaintiff was not present at the time of the affair).  Because Mr. Mills was not

7  present, his IIED claim fails.

8         Second, even when viewing the factual allegations in the light most favorable to

9  Mr. Mills, Mr. Zeichner's conduct was not sufficiently extreme and outrageous to state a

10  claim for IIED.  At worst, Mr. Zeichner manipulated A.K. to do something that Mr. Mills

11  did not want her to do.  Washington cases allowing an IIED claim to proceed involve acts

12  that are far more extreme than those alleged here.  *See, e.g.*, *Grimsby*, 530 P.2d at 295-96

13  (allowing claim to proceed where plaintiff alleged he had to "witness the terrifying agony

14  and explicit pain and suffering of his wife while she [p]roceeded to die right in front of

15  his eyes" as a result of doctor's failure to provide medical care); *Kloepfel*, 66 P.3d at

16  631-32 (affirming jury verdict in favor of plaintiff where defendant stalked plaintiff for at

17  least three years, was convicted multiple times for violations of no-contact orders, called

18  plaintiff over 700 times at her home and place of work, and threatened to kill plaintiff and

19  the man she was dating); *cf. Womack v. Von Rardon*, 135 P.3d 542, 543, 545 (Wash. Ct.

20  App. 2006) (holding the record did not establish "the required intent or necessary

21  severity" to sustain an IIED claim where juveniles took plaintiff's cat from her front

22  porch, doused it in gasoline, and set it on fire, killing it).  The court has little trouble

1    concluding that Mr. Zeichner's conduct was neither extreme nor outrageous.  The court

2    therefore GRANTS Mr. Zeichner's motion for judgment on the pleadings with respect to

3    Mr. Mills's IIED claim.

4         2.  <u>RCW 4.24.010</u>

5         Finally, Mr. Mills raises a claim under RCW 4.24.010, which authorizes a cause of

6    action for damages for the wrongful death or injury of a child.  *See* RCW 4.24.010(1)

7    (providing that a parent "who has regularly contributed to the support of his or her minor

8    child" may maintain "an action as plaintiff for the injury or death of a child").  The

9    statute permits recovery for both economic and non-economic losses, including "for the

10   loss of love and companionship of the child, loss of the child's emotional support, and for

11   injury to or destruction of the parent-child relationship."  RCW 4.24.010(2).  In other

12   words, the statute provides for loss of parent-child consortium damages that flow from

13   the child's injury or death.  *See, e.g.*, *Colleen v. United States*, 843 F.2d 329, 330, 332-33

14   (9th Cir. 1987) (affirming award of $300,000 in non-economic damages under RCW

15   4.24.010 to the parents of an infant who suffered severe and permanently disabling brain

16   damage at birth due to the hospital's negligence).[3]

17   _____

18      [3]  Mr. Mills's claim under RCW 4.24.010 is somewhat out of the ordinary in that he
     seeks loss of consortium damages based on emotional rather than physical injury to A.K.  (*See*
     Compl. ¶¶ 4.14-4.25, 6.B.3 (alleging that Mr. Zeichner's conduct caused mental and emotional

19   harm to A.K., which caused a personality change and physical symptoms of stress).)  Notably,
     the statutory text does not expressly foreclose such claims.  *See* RCW 4.24.010 (placing no

20   limitation on the types of injuries that may be cognizable).  As one court has recognized, whether
     non-physical injuries such as constitutional violations or mental and emotional harm "are

21   cognizable as a child's 'injury' within the meaning of RCW 4.24.010 appears to be a novel
     question of Washington law."  *Jones v. Grant Cnty.*, No. CV-12-0188-EFS, 2012 WL377796, at

22   *7-8 (E.D. Wash. Nov. 1, 2012) (conducting a statutory interpretation analysis and concluding
     that the parents could "seek recovery under RCW 4.24.010 based on . . . violations of [the

1    Mr. Zeichner argues dismissal is warranted because RCW 4.24.010 only

2  authorizes loss of consortium damages that result from injury to the child—not from

3  injury to the parent-child relationship itself, as Mr. Mills has alleged.  (*See* MJP at 22-23

4  (arguing that Mr. Mills merely alleges "his daughter was injured because of damage to

5  the parent-child relationship; not that the injury or death of A.K. caused him to

6  experience damage to his parent-child relationship.").)  The court, however, must

7  liberally construe the complaint, *Erickson*, 551 U.S. at 94, which expressly states that Mr.

8  Zeichner's "wrongful acts harmed [A.K.]'s emotional and physical health, and led to a

9  change in her personality, all of which damaged and continue to damage the parent-child

10  relationship between Plaintiff and [A.K.]."  (Compl. ¶ 6.B.3.)  Stated differently, Mr.

11  Mills asserts that Mr. Zeichner directly injured A.K. which, in turn, injured the

12  parent-child relationship.  The court respectfully disagrees with Mr. Zeichner's

13  characterization of the complaint and declines to dismiss Mr. Mills's wrongful injury

14  claim on this basis.

15    Mr. Mills's wrongful injury claim fails for a different reason:  Mr. Mills has failed

16  to plausibly show that Mr. Zeichner's conduct was wrongful in the eyes of the law.  A

17  claim under RCW 4.24.010 necessarily requires some showing that the defendant's

18  conduct was wrongful, meaning that the defendant can be held legally liable for the

19  offending conduct.  *See Benoy v. Simons*, 831 P.2d 167, 171-72 (Wash. Ct. App. 1992)

20

21  child's] constitutional rights.").  For the reasons explained *infra*, however, the court finds it
   unnecessary to decide whether RCW 4.24.010 contemplates claims predicated on non-physical

22  injury to a child.  The court will assume for purposes of this motion that such a claim is
   cognizable.

ORDER - 24

1   (affirming summary dismissal of claim under RCW 4.24.010 where there was no

2   evidence that the defendant caused the alleged injury, and thus was not liable for that

3   injury); *Johnson v. Ottomeier*, 275 P.2d 723, 725 (Wash. 1954) (explaining that an action

4   for wrongful death is derivative "in the sense that it derives from the wrongful act

5   causing the death"); *Dowler v. Clover Park Sch. Dist. No. 400*, No. 06-2-08565-1, 2012

6   WL 12977571, at *3 (Wash. Super. Ct. Oct. 12, 2012) (dismissing claim for damage to

7   the parent-child relationship under RCW 4.24.010 because it was predicated on other

8   claims that had been dismissed on summary judgment); 7 Robert Michael Ey, Causes of

9   Action 319 § 12 (2d ed. 2023) (explaining that, to state a *prima facie* case of wrongful

10  death or injury, it is "necessary to establish the defendant's liability for the injury or death

11  of the plaintiff's child" (citing *Benoy*, 831 P.2d 166)).  Here, Mr. Mills's Section 1983

12  and IIED claims fail as a matter of law.  (*Supra* §§ III.D.1, E.1.)  It would make little

13  sense to permit a claim under RCW 4.24.010 where the court has dismissed Mr. Mills's

14  other claims and there is no remaining basis on which to hold Mr. Zeichner liable for his

15  allegedly injurious conduct.  Because there is no corresponding showing of potential

16  liability, the court GRANTS Mr. Zeichner's motion for judgment on the pleadings with

17  respect to Mr. Mills's claim under RCW 4.24.010.

18  **F.   Leave to Amend**

19         Mr. Mills requests the court's leave to amend his complaint.  (Resp. at 40.)  A

20  district court should not dismiss a *pro se* complaint "without leave to amend 'unless it is

21  absolutely clear that the deficiencies of the complaint could not be cured by

22  amendment.'"  *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012) (quoting *Schucker v.*

1   *Rockwood*, 846 F.2d 1202, 1203-04 (9th Cir. 1988) (per curiam)).  Conversely, a district

2   court does not abuse its discretion in denying leave to amend where amendment would be

3   futile.  *See Cato v. United States*, 70 F.3d 1103, 1107, 1111 (9th Cir. 1995) (affirming

4   dismissal of *pro se* complaint with prejudice where the claims could not possibly be

5   cured by amendment).

6          The court concludes that amendment would be futile in this case.  There is no set

7   of facts that Mr. Mills could plead, consistent with the allegations in his original

8   complaint, that would overcome qualified immunity or state a claim for IIED.  At its

9   core, this case is about a public high school teacher's conduct in encouraging a student to

10  participate in an extracurricular academic activity.  Controlling Ninth Circuit precedent

11  forecloses the proposition that Mr. Zeichner violated clearly established law based on

12  conduct that occurred inside "the threshold of the school door."  *Fields*, 427 F.3d at 1206.

13  And because the offending conduct occurred entirely outside of Mr. Mills's presence—

14  indeed, he only learned of Mr. Zeichner's conduct months after it occurred—there are no

15  additional facts Mr. Mills could plead that would meet the requirement of physical

16  presence to state a claim for IIED.  *See Reid*, 961 P.2d at 337-38.  Having determined that

17  amendment would be futile with respect to Mr. Mills's Section 1983 and IIED claims, the

18  court concludes amendment would be similarly futile with respect to his wrongful injury

19  claim.  A claim under RCW 4.24.010 necessarily requires some corresponding basis of

20  liability, and here, there is none.  *See Benoy*, 831 P.2d at 171-72.  The court therefore

21  DENIES Mr. Mills's request for leave to amend.

22  *//*

1

## IV.   CONCLUSION

2

For the foregoing reasons, the court GRANTS Mr. Zeichner's motion for

3

judgment on the pleadings (Dkt. # 43) and DENIES Mr. Mills's motions (Dkt. ## 21, 41)

4

as moot.  This matter is DISMISSED with prejudice and the Clerk is DIRECTED to close

5

this case.

6

Dated this 17th day of January, 2024.

7

8

JAMES L. ROBART
United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22